UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

MARK ARAGON,  No. 18-12219- t7

    Debtor.

VANESSA K. BACA,

    Plaintiff,

v.  Adv. No. 18-1082-t

MARK ARAGON,

    Defendant.

## MEMORANDUM OPINION

Plaintiff Vanessa Baca bought a house from Defendant Mark Aragon by paying him $80,000 over time. When Baca had finished making the required payments, the house was still encumbered by a mortgage with a $29,000 balance. The mortgage went into default and the lender foreclosed, leaving Baca homeless. Baca brought this proceeding pro se, asking the Court to, inter alia, declare the amounts Aragon owes her nondischargeable because of fraud and embezzlement. For the reasons set forth below, the Court concludes that the debt, in an amount to be determined by another court, is nondischargeable under § 523(a)(2)(A).[1]

I.     FACTS

The Court finds:[2]

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.
[2] The Court took judicial notice of its docket. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

Aragon bought a house at 702 S. Aspen, Roswell, New Mexico on September 7, 2004. He financed the purchase with a $42,827 mortgage loan from Pioneer Bank.[3] The loan, made on or about August 27, 2004, was to be repaid over 30 years at 6.44% interest. The monthly principal and interest payment was $269.01. The loan was secured by a first mortgage on the house.

On January 5, 2009, Baca and Aragon signed a document titled "Agreement to Sell Real Estate," under which Baca agreed to buy the house for $80,000, with a down payment of $10,500 and monthly payments of $650 until paid in full.[4] As a way to save money, Aragon convinced Baca not to use a real estate broker or title company. Instead, Aragon obtained a form of contract from an undisclosed source, and he and his girlfriend partially filled in the form using a typewriter.[5]

Not surprisingly, the resulting contract is very poorly drafted. It calls for a deed, a seller's affidavit, a title policy, and a current survey, all to be delivered at a transaction "closing" to be concluded before an outside closing date. Both Aragon and Baca were to have attorneys, and the closing was to take place at the office of Aragon's attorney. None of that actually happened. Instead, the closing took place when the form contract had been improperly completed and signed. There were no lawyers, brokers, or title companies involved. The only closing document was a receipt for $10,000.

The following terms from the signed contract are important:[6]

---

[3] At some point the loan was acquired by BOKF, N.A., but for ease of reference the Court will refer to the lender as "Pioneer."

[4] Had Baca paid strictly as agreed, the final payment would have been made in December 2017. Starting in 2014, Baca began paying more then $650 a month when she was able, and paid off the contract about six months early.

[5] At trial, two versions of the first page of the contract were introduced into evidence. The main difference between the two (besides minor typographical changes) is a typed-in sentence about which party pays the real property taxes. In one version, Aragon is responsible for paying the taxes, while Baca is responsible in the other version. The Court makes no finding about which version is the correct one; the differences do not affect the outcome.

[6] The italicized text was typed into the contract by the parties. The quoted language is from the version of the contract Aragon believes to be the correct version.

2. **Purchase Price** *80, Thousand* Dollars ($ *80,000*).

Method of Payment:
(a) Deposit to be held in trust by *Mark Aragon*     $10,500.00 Down
(b) Approximate principal balance of first mortgage to which conveyance shall be subject, if any.
Mortgage holder: *1st Payment 02/01/2009*     $650.00 Monthly
Interest _____percent per annum.

. . .

4. **Restrictions, Easements, Limitations:** Buyer shall take title subject to: (a) Zoning, restrictions, prohibitions and requirements imposed by governmental authority; (b) Restrictions and matters appearing on the plat or common to the subdivision, (c) Public utility easements of record, provided said easements are located on the side or rear lies of the property, (d) Taxes for year of closing, assumed mortgages, and purchase money mortgages, if any, (e) Other: _____.

Baca testified that she signed the contract with no knowledge that the house was mortgaged. She testified that she did not learn about the mortgage until years later, although she could not say exactly when. Aragon, on the other hand, testified that he told Baca about the mortgage from the start. He testified that his agreement with Baca was that she would pay him $80,000 and then own the house subject to whatever remained of the mortgage debt.[7] The Court did not find the testimony of either party on this point particularly reliable.

The only fair reading of the contract is that once Baca paid Aragon $80,000, she would get the deed to the house without any mortgages or other liens. Had Aragon intended Baca to assume the mortgage, he could easily have said so, and indeed was required to say so in paragraph 2(b) and/or 4 of the form contract. Instead, paragraph 4 is not filled in and paragraph 2 was completed improperly, setting out Baca's payments to Aragon rather than identifying an assumed mortgage. Thus, the Court finds that Aragon was obligated to deliver the house to Baca free of the Pioneer mortgage once Baca completed her contract payments.

---

[7] When the parties signed the contract, the mortgage balance was $39,999.68.

-3-
Case 18-01082-t    Doc 27    Filed 08/30/19    Entered 08/30/19 16:51:16 Page 3 of 11

Baca made the $10,000 down payment on January 5, 2009, and an additional $500 down payment on February 3, 2009. Of these initial funds, Aragon only sent $1,000 to Pioneer. The following chart compares what Baca paid Aragon and what Aragon paid Pioneer from January 1, 2009 through December 31, 2016:[8]

| Year | Amounts Baca Paid Aragon[9] | Amounts Aragon Paid Pioneer | Difference |
|---|---|---|---|
| 2009 | $17,800 | $6,808 | $10,992 |
| 2010 | $7,800 | $5,186.61 | $2,613.39 |
| 2011 | $4,959 | $6,724.90 | -$1,765.90 |
| 2012 | $6,609 | $7,493.34 | -$884.34 |
| 2013 | $7,939 | $6,705 | $1,234 |
| 2014 | $8,905 | $8,652.77 | $252.23 |
| 2015 | $8,880.79 | $8,574.13 | $306.66 |
| 2016 | $8,790 | $8,446.16 | $343.84 |
| Total | $71,682.91 | $58,590.91 | |
| Total difference | | | $13,091.88 |

Based on the evidence in the record, the Court concludes that Aragon could have paid off the mortgage with Baca's payments to him, had he wished to. To do so, however, Aragon would have had to pay Pioneer the $13,091.88 he pocketed. Had Aragon applied all of Baca's payments to the Pioneer loan, the loan could have been paid in full before Baca completed her payments.[10]

Instead, after Baca made her last $650 payment in June 2017, the mortgage balance was still about $29,000. The Court finds that Aragon never intended to pay off the mortgage, even

---

[8] There is no information in the record about Aragon's payments to Pioneer in 2017.

[9] These are the amounts for which Baca could find receipts. She testified that she made additional payments. In 2011 in particular, Baca testified that she made regular monthly payments in March, July, August, and December but had no receipts for the payments. The same is true for November 2012.

[10] For reasons not in evidence, Aragon's cost of insuring the house increased from $2,161.73 in 2009 to $3,914.89 a year in 2016. The resulting increase in escrow payments made it more difficult for Aragon to pay off the mortgage. By the time the insurance premium increases had become significant, however, it was too late for Aragon to get the mortgage paid off. Without applying the down payment to the mortgage in January 2009, he could not have done it, even assuming no "hazard" insurance premium increases.

though he could have. The Court also finds that Baca was counting on getting the house free of mortgages and liens, that Aragon was aware of that, and that Aragon did not tell Baca the truth about his intention because he knew she would not go through with the deal had she known.

Immediately after Baca made her last payment, the Pioneer loan went into default. On November 20, 2017, Pioneer brought a foreclosure action against Aragon and Baca. The action was stayed by Aragon's bankruptcy filing (August 31, 2018), which prompted Pioneer to file a motion for relief from stay (October 4, 2018). The Court entered a stipulated stay relief order on October 23, 2018. The foreclosure was completed in February 2019.

On November 29, 2017, Baca sued Aragon in state court for malicious breach of contract, intentional infliction of emotional distress, abuse of process, and specific performance, commencing *Vanessa Baca v. Mark Aragon*, No. D-504-CB-2017-01185, pending in the Fifth Judicial District Court, State of New Mexico (the "State Court Action"). The State Court Action was stayed by this bankruptcy case, which was filed August 31, 2018.

Baca brought this proceeding against Aragon on December 11, 2018, arguing that Aragon's debt to her is nondischargeable because of fraud and embezzlement. Baca also alleged that Aragon lied to the Court about his 2016 and 2017 income; did not report a recurring payment of $12,650; and used an insurance payment for roof repair of the house to improve his own house.

II. DISCUSSION

A. Fraud.

Baca alleges that Aragon's failure to deliver the house free and clear of the Pioneer mortgage was fraudulent. Section 523(a)(2)(A) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> …

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

The Tenth Circuit BAP has ruled that "false pretenses, a false representation, and actual fraud provide alternative bases for relief:"

> Regarding the § 523(a)(2)(A) decision, we reverse the bankruptcy court's summary judgment decision that a plaintiff must establish a false representation to prevail on a claim for "actual fraud" under § 523(a)(2)(A). Giving full effect to the statute dictates that false pretenses, a false representation, *or* actual fraud can each be a basis for relief under that subsection.

*In re Vickery*, 488 B.R. 680, 682 (10th Cir. BAP 2013).

    1.    <u>False pretenses</u>. Courts in this circuit have construed "false pretenses:"

> [False pretenses are a] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor….
> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*In re Hargrove*, 164 B.R. 768, 772 (Bankr. N.D. Okla. 1994) (quoting *In re Dunston*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990)), *aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo); *see also In re Osborne*, 520 B.R. 861, 868-69 (Bankr. D.N.M. 2014) ("Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions.") (quoting *In re Sturgeon*, 496 B.R. 215, 223 (10th Cir. BAP 2013)); *In re Dunston*, 117 B.R. at 641 (a false pretense is a scheme creating a false appearance or a falsely and fraudulently created situation of fact).

    2.    <u>False representations</u>. "False representations are 'representations knowingly and fraudulently made that give rise to the debt.'" *Osborne*, 520 B.R. at 868 (quoting *Adams Cnty.*

*Dept. of Soc. Services v. Sutherland–Minor (In re Sutherland–Minor),* 345 B.R. 348, 354 (Bankr. D. Colo. 2006)). The representations are of facts. *Field v. Mans*, 516 U.S. 59, 70 (1995); *In re Turner*, 179 B.R. 273, 278 (Bankr. D. Colo. 1995).

A party who signs a contract makes an implied representation that he intends to perform as agreed. If in fact he has no such intention, he has made a false representation under § 523(a)(2)(A). *See, e.g., In re Kukak*, 225 B.R. 778, 785 (10th Cir. BAP 1998) (use of a credit card creates an implied representation regarding a debtor's intent to repay); *In re Ward*, 425 B.R. 507, 516 (Bankr. E.D. Wis. 2010) (a representation that one will perform some future act can constitute a false representation if, at the time, the proponent had no intention of performing the future act); *Bustos v. Muller (In re Muller)*, 2016 WL 3034754, at *4 (Bankr. D.N.M.) (by signing settlement agreement, debtor impliedly represented that she intended to pay as agreed); *In re Hanson*, 437 B.R. 322, 329 (Bankr. N.D. Ill. 2010) (one way misrepresentation can be established under § 523(a)(2)(A) is to show that the debtor executed a contract he never intended to perform); *In re Burns*, 2008 WL 2782659, at *3 (Bankr. M.D. Pa.) (creditor can show a misrepresentation if the contractor-debtor entered into a contract with the intent of never complying with the terms); *In re Drossel*, 2007 WL 3375073, at *6 (Bankr. D.N.J.) (same); *In re Larranaga*, 2010 WL 3521732, at *4 (Bankr. D.N.M.) (same); *In re Antonious*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (same).[11]

---

[11] There is a line of cases holding that implied representations fall within the false pretenses category. *See In re Schmidt*, 70 B.R. 636, 640 (Bankr. N.D. Ind. 1986) (false pretenses involve implied misrepresentations or conduct intended to create and foster a false impression, while false representations are express misrepresentations); *Ames v. Uranus, Inc.*, 1994 WL 482626, at *18 n.12 (D. Kan.) (citing *Schmidt*); *Dunston*, 117 B.R. at 640 (same); *In re Kudla*, 105 B.R. 985, 990 (Bankr. D. Colo. 1989) (same). It does not appear to matter whether a false implied representation of intent to perform a contract is considered a false representation or a false pretense. However, since Tenth Circuit law appears to favor the false representation category, the Court will use it.

3. <u>Actual fraud</u>. Fraud "connotes deception or trickery generally, [but] the term is difficult to define more precisely." *Husky Intern. Electronics, Inc. v. Ritz*, 136 S. Ct. 1581 (2016). This Court has held:

> "'actual fraud' includes "a scheme to deprive or cheat another of property or [sic] legal right." *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 690 (10th Cir. BAP 2013). [And a] treatise states that "Actual fraud consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (16th ed.).

*In re Torres-Montoya*, 584 B.R. 56, 61 n.6 (Bankr. D.N.M. 2018). Actual fraud often involves multiple false representations, though false representations are not a prerequisite to finding actual fraud. *Husky*, 136 S. Ct. at 1587–88; *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 11 (10th Cir. BAP 2016) (citing *Husky*).

4. <u>Knowledge, intent, justifiable reliance, and damages</u>. For false pretenses and false representation, the creditor must also prove by a preponderance of the evidence that

> (1) the debtor made the representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representation having been made. *See, e.g., Field v. Mans,* 516 U.S. 59, 61, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995); *In re Ophaug,* 827 F.2d 340, 342 n. 1 (8th Cir. 1987); *In re Maurer,* 112 B.R. 710, 712–13 (Bankr. E.D. Pa. 1990). In general, this test applies for all three grounds listed in section 523(a)(2)(A) even though the elements for each vary slightly. Thus, a showing of justifiable reliance and causation of loss must be made in order to recover under any component of section 523(a)(2)(A). *See In re Ali,* 321 B.R. 685, 690 (Bankr. W.D. Pa. 2005).

*Antonious*, 358 B.R. at 182; *see also Osborne*, 520 B.R. at 868 (listing the same elements and quoting *Johnson v. Riebesell (In re Riebesell),* 586 F.3d 782, 789 (10th Cir. 2009)).[12]

---

[12] The Supreme Court made clear in *Husky* that actual fraud does not contain the same elements as fraudulent pretenses or representations. 136 S. Ct. at 1587–88.

5. <u>Baca carried her § 523(a)(2)(A) burden of proof</u>. The Court finds and concludes that Aragon impliedly represented that he intended to perform under the contract and deliver the house free of liens and mortgages (including the Pioneer mortgage). In fact, he never intended to do so, as evidenced by his decision to keep almost all of Baca's down payment. Thus, Aragon made a false representation to Baca. Aragon's implied representation of intent to perform was knowing and was made to deceive Baca into buying the house; had she known Aragon would leave her with a defaulted mortgage after she made her final payment, Baca never would have agreed to the deal. Baca relied on Aragon's implied representation of intent to perform. Her reliance was justifiable.[13] She suffered a substantial loss as a result.

B. <u>Embezzlement</u>.

Baca's complaint also seeks a declaration of nondischargeability for embezzlement. Section 523(a)(4) provides that a chapter 7 discharge does not discharge an individual debtor from any debt—

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . .

Baca's embezzlement count fails. In *In re Brown*, 457 B.R. 919 (Bankr. M.D. Ga. 2011), the court set out the elements of embezzlement:

> "Embezzlement is the fraudulent appropriation of *property by a person to whom such property has been entrusted*, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking." As with fraud, federal common law controls the definitions of embezzlement and larceny for purposes of nondischargeability. To establish embezzlement, *a plaintiff must show an appropriation by the debtor of*

---

[13] Baca had constructive knowledge of the mortgage. *See* N.M.S.A. § 14-9-2 ("[Recorded instruments] shall be notice to all the world of the existence and contents of the instruments so recorded from the time of recording"); *see also Angle v. Slayton*, 102 N.M. 521, 523 (S. Ct. 1985) (real property buyers are on constructive notice of recorded documents affecting the property). However, Baca could reasonably conclude that her $80,000 was more than enough to pay off a $40,000 mortgage.

> *funds lawfully in the debtor's possession, for the debtor's use or benefit, with fraudulent intent*.

457 B.R. at 926 (emphasis added) (internal citations omitted). Under the contract, once Baca made a payment to Aragon, the money became Aragon's, not Baca's. It was not held in trust. As Aragon cannot embezzle his own funds, Baca's embezzlement count fails.

C.     Denial of Discharge.

Baca alleged in her complaint facts that might warrant denial of the discharge under § 727(a)(2) or (4). However, Baca presented no evidence at trial to prove the allegations. The Court therefore rules against Baca on her denial of discharge count.

D.     Amount of the Debt.

Baca has a valid claim against Aragon for substantial damages. She did not ask this Court to fix the damages or award her a money judgment. Therefore, the amount the debt and the nature of the judgment will have to be determined in the State Court Action or elsewhere. For the Court's purposes, it suffices to hold that there is a debt of some amount, and that it is nondischargeable under § 523(a)(2)(A).[14] In addition, all actual damages, punitive damages, and other damages directly related to the false representation are nondischargeable. *See Cohen v. de la Cruz*, 523 U.S. 213 (1998).

### III.     CONCLUSION

Baca showed by a preponderance of the evidence that Aragon's implied representation of intent to perform under the contract falls under the § 523(a)(2)(A) "false representation" standard. Her claim against Aragon, in an amount to be determined by another court, is nondischargeable

---

[14] *See In re Thompson*, 555 B.R. at 8 (determining a § 523(a) dischargeability complaint is a two-step process: first, determine whether there is a debt; second, determine whether the debt is dischargeable).

under that subsection. Baca's remaining asserted claims (i.e. actual fraud, embezzlement, and denial of discharge) are overruled. The Court will enter a separate judgment.

_____
Honorable David T. Thuma
United States Bankruptcy Judge

Entered: August 30, 2019
Copies to: electronic notice recipients

Vanessa K. Baca
13305 Oriente Ave. NE
Albuquerque NM 87123

-11-
Case 18-01082-t    Doc 27    Filed 08/30/19    Entered 08/30/19 16:51:16 Page 11 of 11